UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Barbara Kimble-Parham,

Plaintiff,

v.

**MEMORANDUM OPINION AND ORDER**
Civil No. 00-1242 ADM/AJB

Minnesota Mining and Manufacturing, Michael Jozwiakowski, Ken Phares,[1] and Ray Skwierszynski,

Defendants.

---

Stephen W. Cooper, Esq., The Cooper Law Firm, Minneapolis, MN, appeared for and on behalf of Plaintiff.

Kathleen M. Mahoney, Esq., Oppenheimer, Wolff & Donnelly, LLP, Minneapolis, MN, appeared for and on behalf of Defendants.

---

## I. INTRODUCTION

On May 14, 2002, the Motion for Summary Judgment [Doc. No. 26] of Defendants Minnesota Mining and Manufacturing ("3M"), Michael Jozwiakowski and Ray Skwierszynski (collectively "Defendants"), was argued before the undersigned United States District Judge. Plaintiff Barbara Kimble-Parham ("Plaintiff") alleges age, race, gender and disability discrimination and harassment, as well as aiding and abetting discrimination and reprisal, retaliation, negligent training, breach of contract, intentional infliction of emotional distress, and negligent hiring, retention and supervision of management employees. For the reasons set forth below, the Motion is granted in part and denied in part.

[1] Plaintiff conceded at oral argument that Defendant Ken Phares is not a part of this lawsuit because he was never served in this action.

FILED OCT 1 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD.______
DEPUTY CLERK______

## II. BACKGROUND

Plaintiff is an African-American woman born on May 28, 1954. She began at 3M in 1985 as a master laboratory technician (Technician Level 94) in the Conventional Drug Delivery Department ("CDD"). During the relevant time periods, Plaintiff was the only permanent African-American employee, and the only employee with medically-related work restrictions, in her department. Jozwiakowski Dep. at 185-86.

Plaintiff advanced to a Level 96 position on the Technologist Ladder in 1993, after demonstrating the requisite ability and satisfying the necessary course requirements. Plaintiff took an educational leave of absence in 1997 to complete her college degree, and in September, 1997, she was placed in the T-1 position on the Technical Ladder.

3M's personal work schedule program permits salaried employees to vary the times they arrive and leave work, subject to the needs of the business. Beuning Aff. Ex. 8. However, all 3M salaried employees are required to be at work between the "core hours" of 9 a.m. and 3 p.m. Id. In the early 1990s, Plaintiff sought medical treatment for stomach problems, which her gastro-enterologist diagnosed as "irritable bowel syndrome." Id. Ex. 1 at 250-51. Plaintiff requested to be exempt from the core hour requirements because her symptoms were more pronounced in the early mornings. 3M agreed to abide by the start times set by her doctor, allowing her to start later than 9 a.m. and adjusting her core hours to 1 p.m. to 5 p.m. Id. at 339, Exs. 9-13. During the first month of her adjusted schedule, February 3-28, 1997, Plaintiff failed to arrive at work by 1 p.m. on 14 of the 18 days she worked. Id. Ex. 14. On March 6, 1997, 3M notified Plaintiff that this was unacceptable. Id. On December 10, 1997, and again on February 10, 1998, 3M notified Plaintiff that her degree of compliance with the agreed work hours was

still unacceptable. Id. Exs. 15, 16. Plaintiff's December 10, 1997, Medical Information Request Form stipulated a start time of 10:30 a.m., with occasional starts past 11:30 a.m. Work records for December, 1997, and January, 1998, show that Plaintiff arrived prior to 10:35 a.m. five times during the 38 work days, and nine times arrived later than 11:30 a.m. Id. Ex. 16. These issues resulted in Plaintiff receiving a "U" (unsatisfactory) work performance rating in 1997; her first "U" rating in her 13 years at 3M.

Beginning in 1996, Plaintiff made several requests for a different supervisor. At the time of the first request, her supervisor was Pat Roddy ("Roddy"). Plaintiff testified that she made this request because she wanted to work in the product development side of the CDD, and because she believed Roddy thought she had an "improper relationship" with another employee.[2] Beuning Aff. Ex. 1 at 255-56. In May 1996, Mike Jozwiakowski ("Jozwiakowski"), CDD manager, reassigned Plaintiff to a different supervisor, Ray Skwierszynski ("Skwierszynski").

Over the following two years and four months, Plaintiff lists many complaints about Skwierszynski as her supervisor. Plaintiff alleges that Skwierszynski was constantly trying to "test" her, to make her feel like a failure, and to "go out of his way" to find things she could not do in order to show that he was "the one in power." Id. at 84-85, 176. Plaintiff felt that Skwierczynski's actions "got worse by the day," and that he was treating a co-worker, Jane Li ("Li") the same way.[3] Id. at 86, 174-75. Plaintiff believed that Kim Phan ("Phan"),

---

[2] Plaintiff describes her first request for a change of supervisor as being "a totally different situation" than the subsequent requests, which she asserts were motivated by her having been discriminated against. Beuning Aff. Ex. 1 at 256.

[3] Plaintiff testified that Li was a Ph.D., and that they were "totally different kinds of people." Beuning Aff. Ex. 1 at 85.

Skwierczynski's only other subordinate, was treated better than herself and Li, and that Phan was happy with his treatment of her.[4] Id. at 175, 189.

Plaintiff voiced her complaints about Skwierszynski to Cathy Bell ("Bell") of 3M's Human Resources Department, and to Jozwiakowski. Plaintiff believed that Skwierczynski's behavior toward her was because she was a black female and that he could get away with his treatment of her because "nobody would care." Id. Ex. 1 at 177. Plaintiff also related in an e-mail to Jozwiakowski on March 13, 1997, her feeling that she was being subjected to "emotional and psychological" abuse. Id. Ex. 21.

In March, 1997, Plaintiff took an educational leave, during which she requested that 3M assign her a new supervisor. Prior to Plaintiff's educational leave, Skwierszynski hosted a farewell party for her, after which Plaintiff sent Skwierszynski a note stating: "Thanks for being so thoughtful and kind – it is much appreciated," and another note thanking Skwierszynski for his "support." Id. Exs. 28, 29. Instead of a reassignment, 3M asked Linda Walth ("Walth"), a Human Resources professional, to facilitate communications between Plaintiff and Skwierszynski after Plaintiff's return from educational leave. Walth held joint and individual meetings in the fall of 1997 with Plaintiff and Skwierszynski, and also met with Jozwiakowski, to discuss Plaintiff's job performance issues. Plaintiff continued to feel that Skwierszynski was treating her unfairly, and renewed her request for a different supervisor. On January 1, 1998, Plaintiff was reassigned to work for Ken Phares ("Phares"). Id. Ex. 1 at 338.

As a result of Plaintiff's "U" (unsatisfactory) rating for her work performance in 1997,

---

[4] Phan is an Asian-Pacific female approximately one year older than Plaintiff. Beuning Aff. Ex. 20.

upon her return to work in April, 1998, she was placed on a Corrective Action Plan ("CAP"), in accordance with standard 3M practice. Id. Ex. 39 at 166-67, Ex. 40 at 67, Ex. 41 at 297. Plaintiff's new supervisor, Phares, along with Jozwiakowski, drafted the CAP, which was to encompass a six-month period. Id. Ex. 40 at 71. The CAP articulated that during her previous two performance reviews, 3M had expressed concern about Plaintiff's failure to timely complete agreed upon expectations and the need to increase her work output. Id. Ex. 41. The CAP explained that Plaintiff's "productivity and ability to meet deadlines has been below expectations." Id. During the CAP period, Plaintiff was to (1) complete the milestones in the attached list of goals/expectations, (2) complete other specific tasks defined monthly, (3) maintain the agreed work schedule of 10:30 a.m. to 7:00 p.m., and (4) meet every two weeks with her new supervisor, Phares, to review progress, clarify and modify expectations, and identify areas needing attention. Id. The CAP stated that "[i]f you do not meet the expectations outlined in this attachment, your employment with 3M may be terminated." Id. The attachment contained a detailed and itemized list of specific tasks to be completed by Plaintiff, with identified deadline dates for most tasks. Id.

At the July, 1998, progress review of Plaintiff's CAP, 3M stated that it "contin[ued] to have very serious concerns regarding overall productivity, completion of assigned work, meeting deadlines, and adherence to agreed upon core work hours." Beuning Aff. Ex. 43. 3M's assessment was that "eleven of the nineteen objectives specified in the [CAP] which were due on or before June 30 were either late or not met at all." Id. Plaintiff also arrived at work later than the agreed start time, set to accommodate her medical condition, approximately 50% of the days in April, May and June, 1998. Id. A meeting was held on July 9, 1998, between Plaintiff,

Phares, Jozwiakowski, and Walth, to discuss Plaintiff's CAP progress. "The main message in the meeting was that [Plaintiff] has not met all of the expectations to date for the CAP through June 30, 1998, and that this performance must be improved in the second half of the CAP for [Plaintiff] to retain her position." Id. Ex. 44. Plaintiff's explanations of her performance resulted in three of the expectations originally listed as "not met" being changed to "met," such that her final review noted 14 of 22 milestones met, and eight milestones late or not met. Id. Jozwiakowski's written summary of the meeting concluded as follows: "It was stated clearly by supervision/management that an improved performance in the second half of this CAP is required by September 1998 to prevent the possibility of termination as the outcome of the review (i.e., the performance in the first half was NOT deemed sufficient in the interim check versus the CAP, due to the number of missed and late expectations)." Id. (emphasis in original).

Throughout the second half of the CAP period, 3M sent Plaintiff several updates articulating her progress and stating that her arrival times and work performance continued to be unacceptable. Id. Exs. 48-51. On September 24, 1998, the final summary of Plaintiff's CAP performance was generated. Id. Ex. 52. Of the 28 total evaluable expectations outlined, 14 were completed satisfactorily, seven were completed late, and seven were not completed. Id. at 6. 3M asserts that "[a]s a result of [P]laintiff's failure to satisfy the conditions of her CAP, her employment was terminated on September 30, 1998, due to unsatisfactory job performance." Def. Mem. in Supp. at 7.

Plaintiff contends that her CAP assessment is not a fair representation of her work because her supervisors altered the expectations to prevent her from achieving the identified goals. Plaintiff traces the beginning of her difficulties at work to when Skwierczynski became

her supervisor in June, 1996. This was Skwierczynski's first supervisory position, and he supervised only Plaintiff until December, 1996. Skwierczynski Dep. at 29. When Plaintiff asked Skwierczynski directly if he and others wanted her gone because of her illness, Skwierczynski did not respond. Skwierczynski Dep. at 72-74.

Plaintiff testified that when she started an educational leave in March 1997 to attend classes at Northwestern University in Chicago, Illinois, she scheduled appointments with doctors in the Chicago area to coincide with her time there. Kimble-Parham Dep. at 94-97. Plaintiff alleges that Jozwiakowski verbally agreed to allow her a medical leave immediately after her educational leave so that she could stay and see doctors in Chicago. Id. When the educational leave had ended, however, Plaintiff alleges that Jozwiakowski and Skwierczynski insisted that she return to work immediately in St. Paul, Minnesota, without taking the medical leave, in order to "preserve" her job. Id. at 99, 104; Skwierczynski Dep. at 163-64. Plaintiff returned to work on July 7, 1997, to fill out the paperwork for additional leave in order to return to Chicago for medical attention. Kimble-Parham Dep. at 99, 104; Skwierczynski Dep. at 163-64. Plaintiff next returned to work on September 2, 1997. Kimble-Parham Dep. at 113.

Plaintiff alleges that Skwierczynski made it difficult for her to work and that she had never received a negative performance evaluation after 10 years of good performance until Skwierczynski became her supervisor and submitted a "letter of concern" in 1996. Id. at 208-09. Plaintiff asserts that Skwierczynski treated her unfairly and that he was disrespectful, and lied. Id. at 385. In the fall of 1997, Plaintiff asked for assistance from Mitch Brown, an African-American human resource person from another division, but was denied Brown's assistance by Walth. Id. at 279-80. Plaintiff alleges that Skwierczynski changed her work assignments,

blocked her progress on projects, undermined her accomplishments, and acted with hatred towards her. Id. at 370, 385-86. Plaintiff states that when she told Jozwiakowski about Skwierczynski's treatment of her, Jozwiakowski said "that can't be, he's just a big teddy bear." Id. at 386. She alleges that Skwierczynski gave her expectations and priority assignments, and then altered them mid-stream, and assigned others' less-desirable work to her. Id. at 389-90. Plaintiff also asserts that Skwierczynski blocked her into a corner of the laboratory one day and demanded that she tell him what she had told Roddy about him. Id. at 275. Plaintiff felt threatened and concerned about Skwierczynski's hostility towards her, and was afraid to be alone with him.

Plaintiff claims her treatment at work was very stressful and upsetting, caused her to feel demoralized, have chest pains, and made her so sick that she could "barely function," "barely get to work," and "barely do [her] job." Id. The reassignment of Phares as supervisor did not help, Plaintiff asserts, because Phares was friends with Jozwiakowski and Skwierczynski, and he continued to do the same things. Id. at 391. According to Plaintiff, Skwierczynski described their relationship by stating that "[Jozwiakowski's] the new sheriff in town, and [Phares] and I are the deputies." Kimble-Parham Dep. at 352. Plaintiff interpreted the remark as evidence that 3M was "a guy's world." Id.

Plaintiff claims that Phares resented her later start time and forced her to have meetings prior to her designated start time, and would tell her that she was not sick. Id. at 339-40. Plaintiff was then "devastated" when she overheard someone who she believed to be Phares telling a young Caucasian male technician that he needed to learn to do some parts of Plaintiff's job because"he had no intention of [Plaintiff] remaining at 3M." Id. at 214-15. When

Jozwiakowski reassigned Phares as Plaintiff's supervisor, Jozwiakowski allegedly said that "[Phares] is my best friend. And if you say that he's racist, then I'll know that you're lying." Id. at 182. Plaintiff recounts a day when Jozwiakowski walked up to her and allegedly stated "they don't like you," and then walked away. Id. at 321. Plaintiff alleges Jozwiakowski was resentful because he told her that "diversity is fine, but if we didn't have diversity we would get more work done because we'd have less conflict." Id. at 317-18.

Plaintiff claims that Jozwiakowski told her that she must understand that Skwierczynski and Phares felt uncomfortable giving orders and instructions to Plaintiff because "it felt like they were giving instructions to their mother." Id. at 379-80. She claims Jozwiakowski told her that he understood their discomfort because he once supervised an older woman at a previous job. Id. Plaintiff asserts that Skwierczynski also made age-based comments to her. While discussing the appropriate attire to wear to a company 1950s party, Plaintiff alleges Skwierczynski said to her "Barb, you have to remember that some of us weren't born in the '50s." Id. at 381. During another discussion, Plaintiff alleges Skwierczynski also said to her "Barb, you forget that some of us aren't old enough to have parents that are retired." Id. at 382. Jozwiakowski also allegedly commented on the employment of persons over 65 by asking "why would somebody work when they don't have to?" Id. at 409-10.

Plaintiff asserts she was not given the chance to rebut inaccuracies in her CAP evaluation prior to her termination. Jozwiakowski Dep. at 252-53. Plaintiff also claims that she was criticized and terminated for having incomplete notebooks from years prior when other non-minority, not disabled, employees were not terminated for their failure to complete such notebooks. Kimble-Parham Dep. 355-56. Plaintiff also asserts that Rich Dupont ("Dupont"), a

younger white male with no medical restrictions, replaced her. Id. at 353. Jozwiakowski responds that Dupont took over some of her duties, but other employees assumed other of her duties. Jozwiakowski Dep. at 154.

## III. DISCUSSION

### A. The Claims

The nine claims asserted by Plaintiff are: Count One, racial discrimination and harassment and aiding and abetting the same; Count Two, age discrimination and harassment and aiding and abetting the same; Count Three, gender discrimination and harassment and aiding and abetting the same; Count Four, disability discrimination and harassment and aiding and abetting the same; Count Five, reprisal and aiding and abetting reprisal; Count Six, negligent supervision, training and hiring; Count Seven, breach of contract;[5] Count Eight, negligence; and Count Nine, intentional infliction of emotional distress. Am. Compl. at 7-18.

### B. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving

[5] Plaintiff conceded at oral argument that the breach of contract claim was withdrawn; Count Seven is dismissed.

party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). Further, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . . Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citation omitted).

**C. Statute of Limitations**

**1. MHRA Claims**

Defendants contend that Plaintiff's Minnesota Human Rights Act ("MHRA") claims are time-barred. Under the MHRA, a plaintiff must file a charge or commence litigation within 365 days of the alleged discriminatory conduct. Minn. Stat. § 363.06 Subd. 3 (2002). Plaintiff filed her charge of discrimination on July 15, 1999. Thus, Defendants assert that only actions occurring between July 14, 1998, and July 15, 1999, are actionable under the MHRA.

Where a plaintiff timely files an administrative charge of discrimination, as Plaintiff did here with the Minnesota Department of Human Rights ("MDHR"), a lawsuit alleging violations of the MHRA must be brought within 45 days of the charging party's receipt of a notice dismissing the charge. Minn. Stat. § 363.14 Subd. 1(1). Here, the MDHR sent Plaintiff a dismissal notice and right to sue letter on March 29, 2000.

Under Minnesota Rule of Civil Procedure 3.01, an action is commenced upon service of a complaint. See Appletree Square I, Ltd. Partnership v. W.R. Grace & Co., 29 F.3d 1283, 1286 (8th Cir. 1994); Ochs v. Streater, Inc., 568 N.W.2d 858, 859-60 (Minn. Ct. App. 1997). The first

service of a Complaint upon a Defendant in this case was on December 6, 2000. Federal courts apply a different rule, that is "[a] civil action is commenced by filing a complaint with the court." Fed. R. Civ. P. 3. Plaintiff asserts that under Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), federal procedural law applies to state claims in federal court. Defendants argue that "[s]ince State law commencement procedures apply to the Plaintiff's pendent State law claims, service of the Complaint is required to satisfy the timing requirements of the MHRA." McKenzie v. Lunds, Inc., 63 F. Supp. 2d 986, 1002 (D. Minn. 1999).

Federal Rule of Civil Procedure 3 does not affect the operation of Minnesota Rule of Civil Procedure 3.01 in this case. In Walker v. Armco Steel Corp., 446 U.S. 740 (1980), the United States Supreme Court held that "Rule 3 governs the date from which various timing requirements of the Federal Rules begin to run, but does not affect state statutes of limitations." Id. at 751. The Supreme Court explained that:

> There is simply no reason why, in the absence of a controlling federal rule, an action based on state law which concededly would be barred in the state courts by the state statute of limitations should proceed through litigation to judgment in federal court solely because of the fortuity that there is diversity of citizenship between the litigants. The policies underlying diversity jurisdiction do not support such a distinction between state and federal plaintiffs, and Erie and its progeny do not permit it.

Id. at 753. The Eighth Circuit applied Walker to cases based on federal question jurisdiction, holding that the Walker rationale "does not change 'solely because of the fortuity' that [the plaintiff] pleaded a federal claim along with state claims." Appletree, 29 F.3d at 1286. Therefore, Walker dictates Plaintiff's claims that would be barred in state court should not be allowed to proceed in federal court. Id.

Plaintiff served her Amended Complaint on December 6, 2000,[6] more than eight months after receiving the dismissal notice from the MDHR, which specified the claims were to be brought within 45 days. Plaintiff's MHRA state law claims are not saved by the filing of the Complaint in federal court. The doctrine of continuing violations also does not save Plaintiff's MHRA claims, for reasons explained in the next section.

Plaintiff's claims of denied promotions allegedly occurring before 1993 and in 1997, were filed over a year after the statutory period set by Minn. Stat. § 363.06 and are also time-barred and dismissed. High v. University of Minn., 236 F.3d 909, 909 (8th Cir. 2000).

**2. Discrimination Claims Against 3M**

Plaintiff's Title VII discrimination claims against 3M survive. Under Title VII, Minnesota plaintiffs must file a charge within 300 days of the challenged conduct. 42 U.S.C. § 2000e-5 (2002). Because Plaintiff filed her charge of discrimination on July 15, 1999, Defendants argue that only actions occurring between September 18, 1998, and July 15, 1999, are actionable under Title VII.

It is undisputed that Skwierszynski ceased to supervise Plaintiff on December 31, 1997. Kimble-Parham Dep. at 338. Skwierszynski signed Plaintiff's 1997 Performance Appraisal on April 6, 1998. Beuning Aff. Ex. 38. Defendant argues that all claims against Skwierszynski, and any claims premised on Skwierszynski's actions, must be dismissed because his actions occurred outside the statute of limitations. "[T]he last possible date on which the Plaintiff could properly complain of discrimination . . . [is] the last day on which [she] actually performed any

[6] The original Complaint was filed on May 18, 2000, but never served, and the Amended Complaint was filed on May 22, 2000.

employment duties for the Defendant." McKenzie, 63 F. Supp. 2d at 995. Plaintiff was terminated on September 30, 1998.

Plaintiff argues that under the doctrine of continuing violations her Title VII and MHRA discrimination claims, Counts One through Four, should not be time-barred. Where an unlawful employment practice manifests itself over time rather than in a series of discrete acts, a plaintiff need not prove that the entire violation occurred within the actionable period, but only that " at least one incident of harassment occurred within the limitations period." Giuliani v. Stuart Corp., 512 N.W.2d 589, 595 (Minn. Ct. App. 1994) (citing Lane v. Ground Round, Inc., 775 F. Supp. 1219, 1224 (E.D. Mo. 1991)). "One must distinguish between discriminatory acts and discriminatory effects; '[t]he proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences* of the acts became most painful.'" Sigurdson v. Isanti County, 448 N.W.2d 62, 67 (Minn. 1989) (quoting Lorance v. AT & T Technologies, Inc., 490 U.S. 900, 907 (1989) (citation omitted) (emphasis in original)).

Here, all actions by Skwierszynski occurred outside the statute of limitations period. "The continuing-violation theory extends the statute of limitations where there is 'proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue for so long as to amount to a discriminatory policy or practice.'" Cruz v. Coach Stores, Inc., 202 F.3d 560, 569 n.4 (2d Cir. 2000) (quoting Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir. 1988)). "That two individuals engaged in similar discriminatory behavior is not enough to demonstrate a discriminatory policy or practice." Id. Plaintiff's allegations of similar actions by Jozwiakowski and Phares are insufficient to constitute a continuing violation from the actions of Skwierszynski,

and do not rise to the level of establishing policy or practice within 3M. A continuing violation does not exist unless the similar discriminatory acts over time are the result of a "discriminatory policy or mechanism." Id. Such is not the case here. While Plaintiff has identified several separate comments made by supervising individuals at 3M, she has not demonstrated a discriminatory policy. The statements may shed light on the motivation for Plaintiff's termination, but are insufficient to predicate an extension of the statute of limitations under the continuing violations theory.

In contrast, Plaintiff's termination date was September 30, 1998. This allegedly discriminatory act did occur after September 18, 1998, and is within the statutory period. Accordingly, summary judgment on the basis of untimeliness is denied for Plaintiff's Title VII termination claims.

**D. Discrimination**

When a plaintiff puts forth direct evidence that an illegal criterion, such as age, sex, race or disability, was used in the employer's decision to terminate the plaintiff, the court applies the standards enunciated in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), as modified by § 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2(m). Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1156 (8th Cir. 1999). Under this modified Price Waterhouse standard, a defendant is liable for discrimination upon proof by direct evidence that an employer acted on the basis of a discriminatory motive. Proof that the employer would have made the same decision absent the discriminatory motive is only relevant to determining the appropriate remedy. Id.

Where a plaintiff relies on circumstantial, as opposed to direct, evidence of intentional

discrimination, the Court applies the three-stage burden shifting approach developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and later refined by the Court in Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993); Dammen v. UniMed Med. Ctr., 236 F.3d 978, 980 (8th Cir. 2001). Under this framework, the plaintiff bears the initial burden of presenting a prima facie case of discrimination. Dammen, 236 F.3d at 980. If the prima facie case is established, a legal presumption arises that the employer unlawfully discriminated against the plaintiff. Id. This rebuttable presumption shifts the burden[7] to the employer to produce evidence that the plaintiff was rejected (or someone else was preferred) for a "legitimate, nondiscriminatory reason." Id. If the employer articulates such a reason, the presumption disappears and the McDonnell Douglas framework becomes irrelevant. The sole remaining issue is whether the employer discriminated. Id. The plaintiff then has an opportunity to prove, by preponderance of the evidence, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. Proof that a defendant's proffered reason is unpersuasive or contrived does not establish that plaintiff's proffered reason of discrimination is correct, however. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-47 (2000). That is, it is not enough to *disbelieve* the employer, but rather the plaintiff's explanation of intentional discrimination must be *believed*. Id. at 147.

**1. Race Discrimination**

Plaintiff alleges Jozwiakowski told her he agreed with the statement "diversity is fine, but

[7] This framework only shifts the burden of production; the burden of persuasion rests at all times with the plaintiff. Id.

if we didn't have diversity we would get more work done because we'd have less conflict." Kimble-Parham Dep. at 317-18. The statement did not arise in the context of an employment decision, and Plaintiff describes the statement as Jozwiakowski's "repeating something he had heard." Id. Plaintiff also alleges that Jozwiakowski told her that her replacement supervisor, Phares, was his best friend, and that "if you say that he's racist, then I'll know that you're lying." Id. at 182. The comments will be analyzed as indirect evidence by applying the McDonnell-Douglas test.

To establish a prima facie case of racial discrimination a plaintiff must show: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) some evidence that would allow the inference of improper motivation. Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 259-260 (8th Cir. 1996). Plaintiff's protected class status and her termination as an adverse employment action are uncontested. 3M argues that Plaintiff was not qualified for her position. However, Defendants admit that Plaintiff had the capacity to do good work, and the evidence establishes that Plaintiff did perform her job well for at least some of the time she was employed by 3M, was educated to the standards required for her position and was adequately trained. Plaintiff also has identified race related comments being made by her supervisors in the workplace. Plaintiff satisfies her burden of establishing a prima facie case of race discrimination. See Defs. Mem. in Supp. at 18.

3M asserts that its legitimate non-discriminatory reason for firing Plaintiff was unacceptable work performance, shown by her "U" performance rating in 1997, and her failure to satisfactorily complete her CAP. This satisfies Defendants' burden of production. The focus shifts back to Plaintiff to present evidence that "(1) creates a question of material fact as to

whether the defendant's proffered reasons are pretextual and (2) creates a reasonable inference that [race] was a determinative factor in the adverse employment decision." Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 921 (8th Cir. 2000) (quoting Keathley v. Ameritech Corp., 187 F.3d 915, 922 (8th Cir. 1999)). Plaintiff fails to carry this burden. Plaintiff has presented no additional evidence to refute 3M's well-documented reason for terminating her employment or show that 3M's reasons for her termination are a pretext for unlawful race discrimination. Plaintiff's race discrimination claim under Title VII against 3M is dismissed.

**2. Age Discrimination**

The ADEA prohibits an employer from discriminating on the basis of age, if an individual is over 40 years old. See 29 U.S.C. § 631(a) (2002); Dammen, 236 F.3d at 980. The ADEA states in part that "[i]t shall be an unlawful employment practice for an employer [to] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a) (2002). To establish a claim under the ADEA, a plaintiff must show that the defendant intentionally discriminated against him or her. Ziegler v. Beverly Enterprises-Minnesota, Inc., 133 F.3d 671, 675 (8th Cir. 1998).

Plaintiff is relying on direct evidence to support her claim for age discrimination. Williams v. Valentec Kisco, Ind., 964 F.2d 723, 728 (8th Cir. 1992), cert. denied, 506 U.S. 1014 (1992) (holding that a plaintiff may prove discrimination directly by persuading the factfinder that a discriminatory reason more likely motivated the employer). If a plaintiff proves that age was a determining factor in the employer's employment decision, she need not also discredit the employer's stated reason for firing her. Id. Plaintiff alleges the following statements establish

age discrimination:

(1) Jozwiakowski stated to Plaintiff, in the context of discussing her complaints about her supervisor, that Skwierszynski and Phares felt uncomfortable giving orders and instructions to her because "it felt like they were giving instructions to their mother," and that Jozwiakowski sympathized with them because he had once supervised an "older woman" at a previous job. Kimble-Parham Dep. at 379-80.

(2) While discussing appropriate attire for a '50s party, Plaintiff alleges Skwierszynski said to her "Barb, you have to remember that some of us weren't born in the '50's." Id. at 381.

(3) During another discussion, Plaintiff alleges Skwierszynski said to her "Barb, you forget that some of us aren't old enough to have parents that are retired." Id. at 382.

(4) Jozwiakowski also allegedly commented on the employment of persons over 65 years of age by asking, "why would somebody work when they don't have to?" Id. at 409-10.

Similar statements, made by decision-makers involved in the adverse employment decisions, have been found to constitute direct evidence of discrimination. See Williams, 964 F.2d at 729. As the Third Circuit described it:

> A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario. As the Court of Appeals for the Eleventh Circuit noted, the factfinder in this type of case should not 'necessarily examine each alleged incident of harassment in a vacuum. What may appear to be a legitimate justification for a single incident of alleged harassment may look [discriminatory] when viewed in the context of several other related incidents.'

Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990) (quoting Vance v. Southern Bell Tel. and Tel. Co., 863 F.2d 1503, 1510 (11th Cir. 1989), appeal after remand, 983 F.2d 1573 (11th Cir. 1993), cert. denied, 513 U.S. 1155 (1995)).

"Direct evidence" has been defined to exclude stray remarks in the workplace, statements by non-decision-makers, or statements by decision-makers unrelated to the decisional process itself. Price Waterhouse, 490 U.S. at 277. However, the Eighth Circuit has held that "[d]irect evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude." Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir. 1991) (quoting Gray v. University of Ark., 883 F.2d 1394, 1398 (8th Cir. 1989)). Comments indicating a "discriminatory animus" in the decisional process, or those uttered by individuals closely involved in employment decisions, may constitute direct evidence of discrimination. Id. In the corporate context, even comments by non-decision-makers have been held admissible, because "[d]iscrimination is often the result of subtle, unconscious predispositions." Hamblin v. Alliant Techsystems, Inc., 636 N.W.2d 150, 153-54 (Minn. Ct. App. 2001) (citing Madel v. FCI Mktg., Inc., 116 F.3d 1247, 1252 (8th Cir. 1997)). The comments identified by Plaintiff are sufficient to establish a disputed fact question as to whether or not age was a factor in the employer's decision. Defendants' Motion for Summary Judgment on Plaintiff's Title VII age discrimination claim is denied.

**3. Gender Discrimination**

Plaintiff asserts one of the previously discussed statements also serves as direct evidence of gender discrimination. Jozwiakowski's statement to Plaintiff that Skwierszynski and Phares felt uncomfortable giving orders and instructions to her because "it felt like they were giving

instructions to their mother," and that Jozwiakowski sympathized with them because he had once supervised an "older woman" at a previous job, is the identified statement. Kimble-Parham Dep. at 379-80. This statement is not a stray or random comment because it was uttered in the context of Plaintiff's supervisor explaining to her why she was being treated in a way she felt was discriminatory by two of her supervisors. This statement constitutes direct evidence of discrimination and precludes summary judgment.

Plaintiff also alleges that Skwierszynski told her: "Jozwiakowski [is] the new sheriff in town, and [Phares] and I are the deputies." Id. at 352. This made Plaintiff feel 3M was a "guy's world." Id. While this statement appears to have occurred in a more random context, it is arguable evidence of gender discrimination. Defendants' Motion for Summary Judgment on Plaintiff's Title VII gender discrimination claim against 3M is denied.

**4. Disability Discrimination**

Disability discrimination analysis employs the McDonnell Douglas burden-shifting examination. The ADA protects qualified persons with disabilities from discriminatory treatment, and requires employers to offer reasonable accommodation to disabled persons. 42 U.S.C. §§ 12102, 12111 (2002). To obtain relief under the ADA, an aggrieved employee must establish that she has a disability, that she is qualified to perform the essential functions of the job, with or without reasonable accommodation; and that she has suffered adverse employment action because of her disability. Benson v. Northwest Airlines, 62 F.3d 1108, 1112 (8th Cir. 1995). The ADA defines a qualified person with a disability as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of his or her job. 42 U.S.C. § 12111(8) (2002). Plaintiff does not claim a disability causing an inability to

work, nor a failure to accommodate by 3M. Rather, Plaintiff argues that 3M accommodated her alleged disability by allowing her to have a delayed start time, but then used that accommodation as a basis for her termination. Kimble-Parham Dep. at 255-56. Accordingly, the gravamen of Plaintiff's argument is that Defendants retaliated against her, rather than discriminated against her based on a disability.

Plaintiff's assertions are not sufficient to maintain a claim of disability discrimination. First, Plaintiff has not established that she is a disabled person within the meaning of the ADA. Plaintiff only qualifies as disabled if she has an impairment that substantially limits one or more major life activities. 42 U.S.C. § 12102(2) (2002); Minn. Stat. § 363.01, Subd. 13 (2002); Fjellestad v. Pizza Hut of Am., Inc., 188 F.3d 944, 948 (8th Cir. 1999). "Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, breathing, learning and working," as well as "[s]itting, standing, lifting and reaching." Id. The undisputed evidence shows that Plaintiff was not substantially limited in any major life activity. Plaintiff testified that her irritable bowel syndrome did not interfere with any of her daily activities such as taking care of herself, getting dressed, cooking, etc., and that it also did not interfere with her ability to do her job, except that "when [she] needed to be in the bathroom obviously [she] couldn't be elsewhere." Kimble-Parham Dep. at 252-53, 361-62. Plaintiff was not prevented from performing "an entire class or broad range of jobs," nor from performing her own job at 3M. Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1207 (8th Cir. 1997). Plaintiff fails to establish that she has an ADA recognized disability, and summary judgment on her Title VII disability discrimination claim, Count Four, is granted.

**E. Harassment**

Plaintiff charges harassment claims on the basis of race, age, gender and disability in Counts One through Four of the Amended Complaint. Plaintiff provides no argument in support of her claims for harassment. Under Title VII, harassment is pervasive when incidents of harassment occur either in concert or with regularity. Andrews, 895 F.2d at 1483. However, Plaintiff provides no evidence that her work environment was hostile. To establish a claim of discrimination based on a hostile work environment, Plaintiff must demonstrate that the 3M workplace was "dominated by" racial, gender, age or disability "based hostility and harassment." Ways v. City of Lincoln, 871 F.2d 750, 754 (8th Cir. 1989). To sustain such a claim, "an employee must establish that his or her employer has created or condoned the continuing existence of a work environment that significantly and adversely affects [her] psychological well-being." Id. Adducement of a few isolated incidents of race, gender, age or disability-based harassment or hostility is insufficient to establish a Title VII violation. Id. Rather, a plaintiff must show that she has endured a "steady barrage of opprobrious [discriminatory] comment." Id. (citing Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981)). Plaintiff has identified several comments made by her supervisors which arguably embody racial, gender and age-based animus. However, she has not demonstrated that these occurrences were so frequent or pervasive as to constitute a "steady barrage" such that her workplace was "dominated" by them. Off-hand comments and isolated incidents do not generally constitute severe or pervasive harassment. Klein v. McGowan, 198 F.3d 705, 709 (8th Cir. 1999). While Plaintiff relates some insensitive and inappropriate comments made to her, and some incidents which upset her, she has not shown that Defendants have engaged in conduct constituting a hostile work environment,

particularly within the statute of limitations period. Defendants' Motion for Summary Judgment on Plaintiff's Harassment claims is granted; these components of Counts One through Four are dismissed.

**F. Discrimination Claims Against Individuals under Title VII**

Plaintiff alleges discrimination under Title VII against the individuals Jozwiakowski and Skwierszynski. Title VII prohibits discrimination by an employer, not an individual. 42 U.S.C. § 2000e(b) (2002). "[I]ndividuals, whether co-employees or supervisors, cannot be held liable under Title VII." D.W. v. Radisson Plaza Hotel Rochester, 958 F. Supp. 1368, 1375 (D. Minn. 1997) (citing Lenhardt v. Basic Inst. of Tech., Inc., 55 F.3d 377, 380-81 (8th Cir. 1995) ("[A]n employee, even one possessing supervisory authority, is not an employer upon whom liability can be imposed under Title VII.")). Defendants Jozwiakowski and Skwierszynski are entitled to summary judgment on Plaintiff's Title VII discrimination claims.

**G. Aiding and Abetting**

Defendants argue that Jozwiakowski and Skwierszynski are also entitled to summary judgment on Plaintiff's aiding and abetting claims as a consequence of the MHRA claims being time-barred.[8] Aiding and abetting under the MHRA is established by a showing that a defendant intentionally aided, abetted, incited, compelled or coerced a person to engage in any of the practices forbidden by the Act. Minn. Stat. § 363.03 Subd. 6 (2002); see also Wallin v. Minnesota Dept. of Corr., 598 N.W.2d 393, 406 (Minn. Ct. App. 1999); Davis v. Hennepin

---

[8] Though the Amended Complaint does not specify the statutory basis for these claims, the Court assumes Plaintiff invokes the aiding and abetting subdivision of the MHRA, Minn. Stat. § 363.03, Subd. 6.

County, 559 N.W.2d 117, 123 (Minn. Ct. App. 1997), review denied, (Minn. May 20, 1997) (holding the aiding and abetting provision requires intentional conduct and that actions are judged based on their objective reasonableness, and further noting that the proof required to sustain the claim is similar to that required for actual malice). Plaintiff argues Jozwiakowski and Skwierszynski are individually liable because each qualify as "any person" who participates in violating the MHRA under Minn. Stat. § 363.03 Subd. 6. See Ulrich v. City of Crosby, 848 F. Supp. 861, 869 (D. Minn. 1994). However, since no viable MHRA violation remains, Plaintiff's aiding and abetting claims predicated on MHRA violations are dismissed.

Under Title VII, the agent of a defendant is also potentially liable for aiding and abetting. 42 U.S.C. § 2000e(b) (2002); Pascutoi v. Washburn-McReavy Mortuary, Inc., 1975 WL 3615, at * 2 (D. Minn. July 2, 1975) (upholding personal liability of "the person who hired her, fired her, and allegedly discriminated against her in the assignment of duties during her employment"). Plaintiff relies on Tafoya v. Adams, 612 F. Supp. 1097, 1104 (D. Colo. 1985), aff'd on other grounds, 816 F.2d 555 (10th Cir.), cert. denied, 484 U.S. 851 (1987), for the proposition that a supervisor was considered an "employer" and subject to Title VII personal liability. However, several years after Tafoya, the "[Tenth] Circuit reversed itself and held that 'Title VII is against the employer, not individual employees whose action would constitute a violation of the Act.'" Turner v. Randolph County, N.C., 912 F. Supp. 182, 185 (M.D.N.C. 1995) (citing Sauers v. Salt Lake County, 1 F.3d 1122, 1125 (10th Cir. 1993)). The Sauers court held that supervisory employees could be named in their official capacity as agents of the employer, but the individual could not be held personally liable under Title VII. Sauers, 1 F.3d at 1125.

While the parties cite no Eighth Circuit case on point, "many circuits have addressed the issue of individual liability under Title VII and the majority interpret the term 'employer' to exclude individual supervisors." Turner, 912 F. Supp. at 185 (citing authority from the Fifth, Sixth, Ninth, Tenth and Eleventh Circuits against individual liability under Title VII, in opposition to the Fourth Circuit). The Eighth Circuit has not directly addressed this issue. Tenny v. Basilica of Saint John, No. 4-94-CV-30102, 1995 WL 935700, at * 9 (S.D. Iowa May 23, 1995). In Smith v. Saint Bernard's Reg'l Med. Ctr., 19 F.3d 1254, 1255 (8th Cir. 1994), the Court held that liability under Title VII attaches only to employers. However, that case involved an employee who was not in a supervisory capacity over the plaintiff. Id. The District Courts in this Circuit are likewise split on the issue. Compare, e.g., Engle v. Barton County Mem. Hosp., 864 F. Supp. 118, 119-20 (W.D. Mo. 1994) (holding no individual liability), and Williams v. Rothman Furniture Stores, Inc., 862 F. Supp. 239, 240-41 (E.D. Mo. 1994) (same), with, e.g., Russell v. City of Overland Police Dep't, 838 F. Supp. 1350, 1352 (E.D. Mo. 1993) (holding individual liability).

This Court chooses to resolve the debate by relying on the Eight Circuit holding in Smith, that liability under Title VII "can attach only to employers." Smith, 19 F.3d at 1255. Accordingly, Plaintiff's aiding and abetting claims under Title VII are dismissed.

**H. Reprisal**

Plaintiff alleges retaliation claims against 3M, Jozwiakowski and Skwierszynski.[9] "To

[9] Plaintiff apparently invokes the reprisal subdivision of the MHRA, Minn. Stat. § 363.03, Subd. 7. Because Plaintiff's MHRA claims are untimely, any retaliation claims predicated on the MHRA are dismissed.

establish a prima facie case of retaliation, a plaintiff must show that she engaged in statutorily protected activity, that the defendant took adverse action against her, and a causal connection between the two." Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997). The defendant may then rebut the plaintiff's case by advancing a legitimate, non-retaliatory reason for the adverse employment action. Id. If the defendant makes this showing, the plaintiff must show that the defendant's proffered reason was a pretext for illegal retaliation. Id.

Plaintiff's Complaint does not specify a "statutorily protected activity." Plaintiff's argument for retaliation is that she presented a legitimate medical work restriction, Defendants reluctantly accommodated her, and then retaliated by making her work experience unbearable and stressful. Plaintiff further alleges that when she complained about what she felt was unfair and discriminatory behavior by her supervisors, 3M did not adequately respond, but instead found a way to terminate her by setting her up to fail her six-month CAP program. Assuming, arguendo, that Plaintiff could show the requisite causal connection between her "protected activity" and her termination, 3M has met its burden of producing a non-retaliatory explanation for its actions: Plaintiff's unsatisfactory work performance. Plaintiff fails to put forth adequate evidence to show that 3M's proffered explanation is merely a pretext for retaliation. Plaintiff initially requested the later start time in early 1997, and had been making requests for different supervisors since 1996. Significantly, Plaintiff was not fired until September 1998. Plaintiff fails to show that the work performance issues documented by 3M, and her failure to successfully complete her CAP, were pretexts for retaliation rather than legitimate workplace concerns. Plaintiff's reprisal claim, Count Five, is dismissed.

**I. Intentional Infliction of Emotional Distress**

"To sustain a claim for intentional infliction of emotional distress, plaintiff must establish: (1) the conduct was extreme and outrageous; (2) the conduct was intentional or reckless; (3) it caused emotional distress; and (4) the distress was severe." K.A.C. v. Benson, 527 N.W.2d 553, 560 (Minn. 1995) (citation omitted). "The actor must intend to cause severe emotional distress or proceed with the knowledge that it is substantially certain, or at least highly probable, that severe emotional distress will occur." Id. To submit such a claim to a jury, a plaintiff must meet a "high threshold." Glass v. IDS Fin. Servs., Inc., 778 F. Supp. 1029, 1073 (D. Minn. 1991). Intentional infliction of emotional distress claims are particularly narrow in scope and limited to cases of particularly egregious facts, wherein "the conduct in question [is] 'so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community.'" Id. (quoting Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 439 (Minn. 1983)). To avoid summary judgment, a plaintiff must prove the conduct is sufficiently offensive to meet the articulated standard. The alleged behavior by 3M and its employees is arguably "not in keeping with the highest standards of professionalism or . . . common courtesy," but does not support an intentional infliction of emotional distress claim. Glass, 778 F. Supp. at 1074. "[F]alling short of established standards of professionalism and courtesy is a far cry from engaging in conduct that is so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." Id. Defendants' Motion for Summary Judgment on Count Nine of Plaintiff's Amended Complaint is granted.

**J. Negligence**

**1. Preemption**

"Plaintiff's negligence claims arise out of the same facts applicable to [her] MHRA claims." McKenzie, 63 F. Supp. 2d at 1006. Plaintiff's claims "arise out of the same duty not to discriminate . . . [that is] required under the MHRA." Id. To be pursued simultaneously, "the plaintiff's negligence claims must be founded on a duty of care independent from duties owed under the MHRA." Id. Thus, Defendants argue that Plaintiff's negligence claims are "necessarily preempted by application of the MHRA." Id.; see also Olson v. City of Lakeville, No. CX966170, 1997 WL 561254, at *1 (Minn. Ct. App. Sept. 9, 1997).

However, MHRA preemption only precludes "double *recovery* . . . when the same conduct forms the basis for both an MHRA claim and a tort claim." Vaughn v. Northwest Airlines, Inc., 558 N.W.2d 736, 745 (Minn. 1997) (citing Wirig v. Kinney Shoe Corp., 461 N.W.2d 374, 361 (Minn. 1990)) (emphasis in original). The Minnesota Supreme Court "expressly rejected the notion that factually parallel *causes of action* are mutually exclusive." Id. (emphasis in original). Because Plaintiff's MHRA claims have been dismissed as untimely, there is no possibility of double recovery. Thus, Plaintiff's state common law negligence claim, Count Eight, and her negligent supervision, hiring and retention claim, Count Six, survive preemption by the MHRA.

**2. Negligent Training**

Minnesota does not recognize the tort of negligent training. McKenzie, 63 F. Supp. 2d at 1006 (citing Mandy v. Minnesota Mining & Mfg., 940 F. Supp. 1463, 1473 (D. Minn. 1996); M.L. v. Magnuson, 531 N.W.2d 849, 856 (Minn. Ct. App. 1995), review denied (Minn., July 20,

1995)). This claim, a component of Count Six, is dismissed.

**3. Negligence, Negligent Hiring, Retention and Supervision**

Under the law of negligence, an employer has a duty to protect its employees from harm where such conduct could have been prevented by the exercise of ordinary care. "The basic elements necessary to maintain a claim for negligence are (1) duty; (2) breach of that duty; (3) that the breach of duty be the proximate cause of plaintiff's injury; and (4) that plaintiff did in fact suffer injury." Hudson v. Snyder Body, Inc., 326 N.W.2d 149, 157 (Minn. 1982) (citation omitted). Plaintiff has failed to proffer any evidence to support her negligence claims.

> Liability is predicated on the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others.

Ponticas v. K.M.S. Investments, Inc., 331 N.W.2d 907, 911 (Minn. 1983). An employer's duty in hiring is the same as for retention of an employee. Id. A negligent retention claim may arise "when an employer becomes aware or should have become aware that an employee poses a threat and fails to take remedial measures to ensure the safety of others." Benson v. Northwest Airlines, Inc., 561 N.W.2d 530, 540 (Minn. Ct. App. 1997). Negligent retention claims are limited to circumstances involving a threat of physical injury or actual physical injury. Id. Plaintiff admits that she was not threatened with or subjected to physical injury at 3M. Kimble-Parham Dep. at 375-76. Of Plaintiff's negligence claims, only "negligent supervision derives from the respondeat superior doctrine;" negligent hiring and retention are based on direct liability "for an employee's intentional tort." Yunker v. Honeywell, Inc., 496 N.W.2d 419, 422 (Minn. Ct. App. 1993). Harassment or mistreatment by an employer that does not rise to the level of an

intentional tort is not actionable under the rubric of negligent retention. Bruchas v. Preventive Care, Inc., 553 N.W.2d 440, 442 (Minn. Ct. App. 1996). Plaintiff does not present evidence sufficient to show she suffered a physical threat or injury, that 3M had a special duty, or that 3M had notice of the employee's alleged dangerous propensities.

At oral argument, Plaintiff asserted that the negligence claims were not intended to be stand-alone claims, but rather were "components" of the other claims. Plaintiff has made no showing that 3M owed her any special duty which was negligently breached. Defendants are entitled to summary judgment on all of Plaintiff's negligence claims; Counts Six and Eight are dismissed.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Doc. No. 26] is **GRANTED IN PART** and **DENIED IN PART**,
2. Plaintiff's MHRA claims in Counts One through Four are dismissed,
3. Plaintiff's Aiding and Abetting claims in Counts One through Four are dismissed,
4. Plaintiff's Title VII Discrimination claims against Jozwiakowski and Skwierszynski in Counts One through Four are dismissed,
5. Plaintiff's Title VII Race Discrimination claim against 3M in Count One is dismissed,
6. Plaintiff's Title VII Age Discrimination claim against 3M in Count Two remains,

7. Plaintiff's Title VII Gender Discrimination claim against 3M in Count Three remains,

8. Plaintiff's Title VII Disability Discrimination claim against 3M in Count Four is dismissed,

9. Plaintiff's Reprisal and Aiding and Abetting Reprisal claim, Count Five, is dismissed,

10. Plaintiff's Negligent Supervision, Training and Hiring claim, Count Six, is dismissed,

11. Plaintiff's Breach of Contract claim, Count Seven, is dismissed,

12. Plaintiff's Negligence claim, Count Eight, is dismissed, and

13. Plaintiff's Intentional Infliction of Emotional Distress claim, Count Nine, is dismissed.

BY THE COURT:

ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

Date: October 2, 2002